IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00091–EWN–KLM

DOROTHY H. KELLY,

     Plaintiff,

v.

WOLPOFF & ABRAMSON, L.L.P., a
Maryland limited liability partnership,

     Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

     This is a case arising under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. Plaintiff Dorothy H. Kelly alleges that Defendant Wolpoff & Abramson, L.L.P., violated the FDCPA by misrepresenting the ownership, existence, and/or amount of a debt it was attempting to collect from her. This matter is before the court on "Defendant's Motion for Summary Judgment on All Claims and Memorandum in Support," filed January 14, 2008, and "Plaintiff's Motion for Partial Summary Judgment," filed January 24, 2008. Jurisdiction is proper pursuant to 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

**FACTS**

*1.*    ***Factual Background***

In 1997, Plaintiff opened a credit card account with MBNA American Bank, N.A., ("MBNA").  (Pl.'s Mot. for Partial Summ. J. [hereinafter "Pl.'s Br."], Pl.'s Statement of Undisputed Facts [hereinafter "SOF"] ¶ 1 [filed Jan. 24, 2008]; *admitted at* Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. [hereinafter "Def.'s Resp."], Resp. to Statement of Undisputed Facts [hereinafter "RSOF"] ¶ 1 [filed Feb. 12, 2008].)  In February 2005, this account became delinquent.  (*Id.*, SOF ¶ 2; *admitted at* Def.'s Resp., RSOF ¶ 2.)

Robert Winzinger, MBNA's Assistant Vice President for Card Services, affies that Plaintiff's account was referred to Defendant, MBNA's outside counsel, in April 2005 for collection.  (*Id.*, Ex. 1 ¶ 15 [Winzinger Aff.].)  In June 2005, Defendant initiated arbitration proceedings on behalf of MBNA at the National Arbitration Forum ("NAF") to recover $15,144.42 plus interest and attorneys' fees from Plaintiff.  (*Id.*, SOF ¶ 6; *admitted at* Def.'s Resp., RSOF ¶ 6; Def.'s Mot. for Summ. J. on All Claims and Mem. in Supp. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 4 [filed Jan. 14, 2008]; *deemed admitted in relevant part at* Pl.'s Resp. Re: Def.'s Mot. for Summ. J. on All Issues [hereinafter "Pl.'s Resp."], Resp. to Undisputed Material Facts [hereinafter "RSOF"] ¶ 4

[filed Feb. 6, 2008].)[1]  Plaintiff was served with the arbitration claim and filed a response. (Def.'s Br., SOF ¶ 4; *deemed admitted in relevant part at* Pl.'s Resp., RSOF ¶ 4.)

During the arbitration proceeding, Defendant represented to the arbitrator and Plaintiff that Plaintiff owed a debt of $15,144.42 plus interest and attorneys' fees to MBNA which she refused to pay, and Defendant never altered or amended these representations.  (Pl.'s Br., SOF ¶¶ 9–10; *admitted at* Def.'s Resp., RSOF ¶¶ 9–10.)  Moreover, Defendant also reported this alleged debt to credit reporting agencies and never altered or amended such reports.  (*Id.*, SOF ¶ 11; *admitted at* Def.'s Resp., RSOF ¶ 11.)

In September 2005, while the arbitration proceeding was still ongoing, MBNA "charged off" Plaintiff's account as a bad debt under various applicable banking regulations.  (*See id.*, SOF ¶¶ 3–4; *admitted at* Def.'s Resp., SOF ¶¶ 3–4; Def.'s Br., SOF ¶ 5; *admitted at* Pl.'s Resp., RSOF ¶ 5.)  It is undisputed that Defendant did not inform the arbitrator of MBNA's "charging off" of this debt.  (Pl.'s Br., SOF ¶ 8; *admitted at* Def.'s Resp., SOF ¶ 8.)

In January 2006, the arbitrator entered an award in favor of MBNA and against Plaintiff in the amount of $18,488.43, and notice of this award was sent to Plaintiff.  (Def.'s Br., SOF ¶ 6;

---

[1]Plaintiff proffers no evidence to dispute the fact that Defendant represented MBNA in the NAF proceeding, but nonetheless purports to "deny" this fact because "Plaintiff objected to the arbitration."  (Pl.'s Resp., RSOF ¶ 4.)  Such a denial without evidentiary citation does not create a triable issue of fact.  Ample evidence previously submitted to this court in connection with Defendant's earlier motion to dismiss establishes this fact beyond dispute.  (*See, e.g.*, Mem. of Law in Supp. of Def.'s Mot. to Dismiss [hereinafter "Def.'s Dismiss Br."], Ex. 1 at 1–14 [NAF Filings] [filed Feb. 20, 2007] [demonstrating that Plaintiff was the respondent of a NAF proceeding brought by Defendant on behalf of MBNA and that Plaintiff received notice of this proceeding and personally signed a responsive pleading to MBNA's claim].)

*admitted at* Pl.'s Resp., RSOF ¶ 6.)  The award was issued "over Plaintiff's objection," (Pl.'s Br.,

SOF ¶ 12; *admitted at* Def.'s Resp., RSOF ¶ 12), but Plaintiff never filed a motion asking the

arbitrator to correct, modify, reconsider, or otherwise reopen the arbitration proceedings, (Def.'s

Br., SOF ¶ 7; *admitted at* Pl.'s Resp., RSOF ¶ 7).

      Sometime subsequently, MBNA, through other counsel, filed a motion in state court

seeking confirmation of the arbitration award.  (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)

In August 2006, a state district court issued a judgment confirming the award.  (*Id.*, SOF ¶ 9;

*admitted at* Pl.'s Resp., RSOF ¶ 9.)  Notwithstanding the instant lawsuit, Plaintiff has not filed

any other lawsuit to modify, correct, or vacate the arbitration award.  (*Id.*, SOF ¶ 10; *deemed*

*admitted in relevant part at* Pl.'s Resp., RSOF ¶ 10.)

      As of August 23, 2007, Mr. Winzinger affied that "MBNA retains the right title and

ownership of the debt and at no time transferred the account to a third party." (Pl.'s Br., Ex. 1 ¶

16 [Winzinger Aff.].)  Plaintiff nonetheless contends that her account was sold to Defendant,

and, as evidence, points to her own response to an interrogatory by Defendant:

> On [January 12, 2007,] I made two telephone calls to MBNA.  I talked to Shalere
> at MBNA customer service.  She told me the account was charged off September
> 30, 2005 and sold to a collection agency.  She said a letter had been sent to me on
> January 9, 2007 which would disclose the name of the company that "now owns
> the account."
>
>           \*     \*     \*
>
> I called back.  Florence Garner put me in contact with Sophia in the customer
> assistance department.  She told me the debt had been sold to [D]efendant in the
> [thirty] days between September 30 and October 30, 2007.[2]

---

    [2]It is unclear from Plaintiff's proffered evidence whether she is claiming that
"Sophia"was forecasting the future during this January 12, 2007, phone call, or whether Plaintiff

(Pl.'s Resp., Ex. 1 ¶ 12 [Interog. Resp.].)

**2.      *Procedural History***

On January 15, 2007, Plaintiff filed a complaint in this court, asserting both FDCPA and

Colorado Consumer Protection Act ("CCPA") claims.  (Compl. and Jury Demand [filed Jan. 15,

2007].)  On February 20, 2007, Defendant moved to dismiss Plaintiff's complaint on statute of

limitations, *Rooker-Feldman* doctrine, *res judicata*, and other grounds.  (Def.'s Dismiss Br.)  On

August 17, 2007, I denied this motion.  (Order and Mem. of Decision [filed Aug. 17, 2007]

[hereinafter "8/17/07 Order"].)

On November 6, 2007, Plaintiff filed an amended complaint in which she reasserted her

FDCPA claims only.  (Am. Compl. and Jury Demand [filed Nov. 6, 2007] [hereinafter "Am.

Compl."].)  Specifically, Plaintiff alleged that Defendant's actions violated specific subsections

of the FDCPA barring: (1) "the use or threat of use of violence or other criminal means to harm

the physical person, reputation, or property of any person," 15 U.S.C. § 1692(d)(1); (2) the false

representation of "the character, amount, or legal status of any debt," *id.* § 1692e(2)(A); (3) "the

false representation or implication that any individual is an attorney or that any communication

is from an attorney," *id.* § 1692e(3); (4) "the threat to take any action that cannot legally be taken

or that is not intended to be taken," *id.* § 1692e(5); (5) "the false representation or implication

that the consumer committed any crime or other conduct in order to disgrace the consumer," *id.*

§ 1692e(7); (6) "the use of any false representation or deceptive means to collect or attempt to

---

meant to write that "Sophia" reported that the purported sale of her account had occurred
sometime between September 30 and October 30, 2005.

collect any debt or to obtain information concerning a consumer;" *id.* § 1692e(10); and (7) "the collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law," *id.* § 1692f(1).  (Am. Compl. ¶ 18.)

On January 14, 2008, Defendant moved for summary judgment on all of Plaintiff's claims, essentially arguing that Plaintiff cannot demonstrate a triable issue of fact as to any of them.  (Def.'s Br.)  On February 6, 2008, Plaintiff responded.  (Pl.'s Resp.)  On February 21, 2008, Defendant replied.  (Def.'s Reply Mem. of Law in Supp. of Its Mot. for Summ. J. [filed Feb. 21, 2007] [hereinafter "Def.'s Reply"].)

On January 24, 2008, Plaintiff moved for partial summary judgment with respect to most, but not all, of her FDCPA claims.  Specifically, Plaintiff sought partial summary judgment with respect to all of her FDCPA claims except the first and third, which address: (1) "the use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person," 15 U.S.C. § 1692(d)(1); and (2) "the false representation or implication that any individual is an attorney or that any communication is from an attorney," *id.* § 1692e(3). (Pl.'s Br. at 6–7.)  Plaintiff also sought summary judgment on an FDCPA claim *not* included in her complaint: the FDCPA's ban on "communicating . . . to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed," 15 U.S.C. § 1692e(8).  (*Id.* at 6.)  On February 12, 2008, Defendant responded.  (Def.'s Resp.)  On March 2, 2008, Plaintiff replied.  (Pl.'s Reply Re: Pl.'s Mot. for Partial Summ. J. [filed Mar. 2, 2008] [hereinafter "Pl.'s Reply"].)  These matters are fully briefed and ripe for review.

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the

light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      Evaluation**

The FDCPA was enacted "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e) (2006).  Amongst the broad categories of debt collection practices proscribed by the act are: (1) harassment or abuse; (2) false or misleading representations; and (3) various defined "unfair practices."  *See id.* §§ 1692e–1692f.  The civil liability section of the FDCPA permits a plaintiff to recover actual and statutory damages for violations of the Act.  *See id.* § 1692k.

In the instant case, Plaintiff alleges that Defendant committed various acts in violation of each of the three above-enumerated categories of proscribed practices, and maintains that Defendant is liable as a matter of law on all but two of these alleged violations.  (*See* Pl.'s Br. at 2–7.)  Defendant, by contrast, argues that Plaintiff cannot demonstrate a triable issue of fact as to any of these alleged violations.  (Def.'s Br. at 7–14.)  I assess each party's arguments as they pertain to each alleged FDCPA violation in turn.

**a.      Section 1692(d)(1)**

Section 1692(d)(1) of the FDCPA prohibits "the use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person."  15 U.S.C. § 1692(d)(1) (2006).  Plaintiff contends that Defendant committed perjury during the NAF

proceeding by not informing the arbitrator that MBNA had sold Plaintiff's account to Defendant, and that such perjury constituted "criminal means" harming her property.  (*See* Pl.'s Resp. at 4–5; *see also* 8/17/07 Order at 12.)  Defendant denies that such a sale occurred, and argues that Plaintiff has proffered no admissible evidence so suggesting.  (Def.'s Br. at 7.)

I find that there is no genuine issue of fact as to whether MBNA sold Plaintiff's account to Defendant.  Defendant proffers Mr. Winzinger's sworn affidavit testimony that "MBNA retains the right title and ownership of the debt and at no time transferred the account to a third party," and Plaintiff offers only her own interrogatory response in which she relates an alleged statement by one of MBNA's customer service representatives suggesting that her account was sold to Defendant between September and October 2005 or 2007.  (*See* Pl.'s Br., Ex. 1 ¶ 16 [Winzinger Aff.]; Pl.'s Resp., Ex. 1 ¶ 12 [Interrog. Resp.].)  Defendant maintains that Plaintiff's proffered evidence is inadmissible hearsay, whereas Plaintiff argues that such evidence falls within two subsections of the "party admissions" exception to the rule against hearsay.  (*See* Def.'s Reply at 3–4; Pl.'s Resp. at 7.)  I agree with Defendant.

Federal Rule of Evidence 801(c) defines hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted," and Rule 802 recites that "hearsay is not admissible except as provided by these rules . . . "  Fed. R. Evid. 801(c), 802 (2008).  Rule 801(d)(2), moreover, recites in relevant part that a statement is "not hearsay" if it is "offered against a party and is (A) the party's own statement, in either an individual or representative capacity; . . . or (D) a statement by the party's agent or servant concerning a matter within the

scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(A)–(D)  (2008).

In the instant case, the alleged statements by MBNA's customer service representatives do not fall within the above-cited categories of "party admissions" that are "not hearsay" because Defendant, not MBNA, is Plaintiff's party opponent.  *See* Fed. R. Evid. 801(d)(2)(A)–(D) (2008) (requiring a "party's own statement" or statements by a "party's agent or servant").  As Plaintiff makes no additional argument suggesting the admissibility of these statements, and because they are clearly offered to prove the truth of the matter asserted — *i.e.*, that MBNA sold Plaintiff's account to Defendant  —  I find that they are inadmissible hearsay.  *See* Fed. R. Evid. 801(c), 802 (2008).  Accordingly, as the only evidence pertaining to the purported sale of Plaintiff's account to Defendant is Mr. Winzinger's sworn affidavit testimony that such a sale did not occur, I find there is no genuine issue of fact as to whether this account was ever sold, and thus whether Defendant's alleged failure to so relate to the arbitrator could have constituted perjury harming Plaintiff's property.  As such, I dismiss Plaintiff's FDCPA claim predicated upon a violation of section 1692(d)(1).

### b.    *Section 1692e(2)(A)*

Section 1692e(2)(A) of the FDCPA prohibits "the false representation of . . . the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A) (2006).  In the instant case, Plaintiff argues that Defendant misrepresented all three of these factors because: (1) MBNA's "charging off" of Plaintiff's debt under banking regulations somehow "extinguished" this debt as a matter of law; and (2) Defendant represented to Plaintiff that she owed her entire

debt irrespective of any "financial benefit [MBNA] received from writing off the debt as a loss." (Pl.'s Resp. at 5.)  Defendant, by contrast, argues that there is no legal support for Plaintiff's theory that MBNA's "charging off" of Plaintiff's debt pursuant to banking regulations extinguished this debt, and does not reply to Plaintiff's second argument.  (Def.'s Resp. at 2–5.) For the following reasons, I agree with Defendant, and moreover find that no competent evidence suggests that Defendant misrepresented the amount of Plaintiff's debt.

### i.    *Debt Extinguishment*

Plaintiff's theory of debt extinguishment is premised upon the assumption that Defendant's "charging off" of Plaintiff's debt pursuant to banking regulations somehow "extinguished" this debt as a matter of law.  (*See* Pl.'s Br. at 3–5.)  I first recount the law upon which Plaintiff purports to base this theory, and then analyze whether this law actually supports Plaintiff's argument.

According to generally accepted accounting principles codified into federal regulations and made applicable to MBNA, retail loans that become past due for 180 days "should be classified a Loss and charged off."  Uniform Retail Credit Classification and Account Management Policy, 65 Fed. Reg. 36,903 (June 12, 2000).  Such "charging off" essentially amounts to a ledger book reclassification and is an accounting practice which Defendant freely admits it follows.  *See, e.g.*, *Debt Buyers' Ass'n v. Snow*, 418 F. Supp. 2d 1, 4 (D.D.C. 2006) ("Customarily, if a consumer loan has been delinquent for more than 180 days, the originating lender charges off the loan . . . in its books"); (*see also* Pl.'s Br., Ex. 1 ¶ 10 [Winzinger Aff.] ["Pursuant to regulations adopted by the Federal Reserve Board and the Office of the

Comptroller of the Currency, 180 days after an account becomes delinquent, MBNA charges off an account to profit and loss."].)

Title 26, section 6050P(a) of the United States Code, by contrast, recites that "any applicable entity which *discharges* . . . the indebtedness of any person during any calendar year shall make a return . . . setting forth . . . the name, address, and TIN of each person whose indebtedness was discharged . . . ." 26 U.S.C. § 6050P(a)(1)–(2) (2006) (emphasis added). Under this statute, every applicable entity required to make such a return is also required to "furnish to each [debtor] whose name is required to be set forth in such a return a written statement showing . . . the name and address of the entity required to make such a return, and the information required to be shown on the return with respect to such a person." *Id.* § 6050P(d)(1)–(2). A federal regulation implementing this statute specifies that such entities "must file an information return on Form 1099-C with the Internal Revenue Service." 26 C.F.R. § 1.6050P-1(a)(1) (2008). Moreover, this same regulation recites that:

> Solely for purposes of the reporting requirement . . . a discharge of indebtedness is deemed to have occurred . . . if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date of which the identifiable event has occurred.

*Id.* Section (b)(2) of this regulation defines an "identifiable event" to include: (1) "[a] discharge of indebtedness pursuant to a decision by the creditor, or the application of a defined policy of the creditor, to discontinue collection activity and discharge debt;" and (2) "[t]he expiration of the non-payment testing period as described in paragraph (b)(2)(iv) of this section." *Id.* §

1.6050P-1(b)(2)(i)(G)–(H).  Finally, paragraph (b)(2)(iv) of this regulation recites in relevant

part that:

> There is a rebuttable presumption that an identifiable event under paragraph
> (b)(2)(i)(H) of this section has occurred during a calendar year if a creditor has
> not received a payment on an indebtedness at any time during a testing period . . .
> ending at the close of the year.  The testing period is a 36-month period increased
> by the number of calendar months during all or part of which the creditor was
> precluded from engaging in collection activity by a stay in bankruptcy or similar
> bar under state or local law.

*Id.* § 1.6050P-1(b)(2)(iv).  As one court has explained, these reporting requirements are required

by federal law because "this information . . . allows the IRS to compare the amount of

discharged debt reported by various institutions with the amount of discharged debt reported by

individuals, since . . . gross income to be reported by individuals and under certain circumstances

taxed by the IRS includes 'income from discharge of indebtedness.'"  *Debt Buyers' Ass'n,* 418 F.

Supp. 2d at 5 (citation omitted).

Based on this authority, Plaintiff makes the sophistic argument that Defendant's

"charging off" of Plaintiff's debt pursuant to accounting principles amounted to a "discharge" of

this debt under applicable tax reporting principles, and thus that this "charging off"

"extinguished" this debt as a matter of law.  As Plaintiff relates in just four sentences with no

elaboration:

> Plaintiff's debt was charged off by MBNA under its application of defined policy
> . . . which required the charge off after the expiration of an accounting purpose
> testing period of 180 days of delinquency[.]  Therefore the charge off by MBNA
> was deemed to have occurred[.]  This charge off, and the subsequent reporting of
> the debt to the IRS caused the debt to become taxable income to plaintiff.  This, in
> turn, caused the debt to be extinguished.

(Pl.'s Br. at 5.)  In support of this "argument," Plaintiff cites three cases in which the discharge

of debt — as reflected by a Form 1099-C sent by a creditor to its erstwhile debtor — precluded

the creditor from continuing to attempt collection.  (*See id.* [citing, *e.g.*, *Franklin Credit Mgmt.*

*Corp. v. Nicholas*, 812 A.2d 51, 58–60 (Conn. Ct. App. 2002)].)

Stripped of its inexplicable conflation of entirely unrelated concepts, this argument is

without merit.  Plaintiff apparently contends that: (1) MBNA developed reporting requirements

because it had a "defined policy" of "charging off" debts after 180 days; (2) such reporting

requirements prove Plaintiff's debt became taxable income to her; and (3) taxable income to

Plaintiff proves the extinguishment of her debt as a matter of law.  The first two steps in this

tortured argument collapse under scrutiny, and the third step is irrelevant without proof that

either: (1) MBNA discharged Plaintiff's debt; or (2) Plaintiff's debt became taxable income.

With respect to the first step in Plaintiff's argument, her suggestion that MBNA

developed reporting requirements due to its "defined policy" of "charging off" debt after 180

days bears no intelligible relation to the definitions of "identifiable event[s]" triggering such

requirements, which include: (1) "[a] discharge of indebtedness pursuant to a decision by the

creditor, or the application of a defined policy of the creditor, to discontinue collection activity

and discharge debt;" and (2) "[t]he expiration of the non-payment testing period as described in

paragraph (b)(2)(iv) of this section."  26 C.F.R. § 1.6050P-1(b)(2)(i)(G)–(H) (2008).  Plaintiff

has cited no law suggesting that "charging off" a bad debt under accounting principles is

equivalent to "discharging" that debt, and ample case law suggests otherwise.  *See, e.g.*, *Debt*

*Buyer's Ass'n*, 481 F. Supp. 2d. at 13 (stating that it would "not falsely represent the status of the

debt . . . on a 1099C Form" to recite that a creditor "plans to continue debt collection activities"); *see also Caldwell v. Wachovia Securities, LLC*, No. 3:06-01006, 2007 WL 3036466, at *4 (M.D. Tenn. Oct. 15, 2007) ("Plaintiff has not shown that Wachovia has violated any law when it charged-off Plaintiff's debt while simultaneously attempted to recover that debt in an arbitration proceeding.")  As such, Plaintiff's mere allusion to MBNA's accounting practices — without more — cannot raise a triable issue of fact as to whether MBNA had a policy of "discontinu[ing] collection activity and discharg[ing] debt" after 180 days, particularly in light of the undisputed countervailing evidence that MBNA, through both Defendant and other counsel, continued to pursue Plaintiff's deficiency even after "charging off" her debt, as demonstrated by its filing of a motion in state court in 2006 to seek confirmation of its arbitration award.  (*See, e.g.*, Def.'s Br., SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)  Moreover, despite Plaintiff's misleading conflation of the 180-day delinquency period that triggers accounting requirements with the 36-month "testing period" that triggers reporting requirements, Plaintiff has adduced no evidence suggesting that MBNA did not "receive[] a payment on an indebtedness at any time during" the 36-month "testing period" triggering its reporting requirement under this separate "identifiable event."  *See* 26 C.F.R. § 1.6050P-1(b)(2)(i)(H) (2008).  On the contrary, the unrefuted evidence suggests just the opposite, as both parties agree that Plaintiff only became delinquent on her account in February 2005.  (*See* Pl.'s Br., SOF ¶ 2; *admitted at* Def.'s Resp., RSOF  ¶ 2.)  Accordingly, I find that Plaintiff has failed to demonstrate a triable issue of fact as to whether MBNA ever developed reporting requirements under the above-cited statute and regulation.

Second, even if MBNA had developed such requirements, Plaintiff has failed to show that such requirements would necessarily demonstrate that her debt thereupon became taxable income to her.  On the contrary, under the relevant regulation Plaintiff herself invokes, reporting requirements may arise "whether or not an actual discharge of indebtedness has occurred," and even discharged debt only becomes taxable income under "certain circumstances" which Plaintiff neither deigns to investigate nor discuss.  26 C.F.R. § 1.6050P-1 (a)(1) (2008); *Debt Buyers' Ass'n,* 418 F. Supp. 2d at 5, 13 (noting that "issuance of a 1099 is not a declaration by the issuer that a recipient debtor actually has received taxable income" ).  As such, I find Plaintiff's suggestion that the triggering of reporting requirements *ipso facto* proves the transmogrification of debt into "taxable income" to be bereft of legal support.

Third, in the absence of any competent evidence suggesting that either (1) MBNA discharged Plaintiff debt, or (2) her debt somehow otherwise became taxable income to her, Plaintiff's invocation of case law holding that the discharge of debt precludes a creditor from continuing debt collection efforts is utterly irrelevant.  (*See* Pl.'s Br. at 5 [citing, *e.g.*, *Franklin Credit Mgmt. Corp. v. Nicholas*, 812 A.2d 51, 58–60 (Conn. Ct. App. 2002)].)

In short, Plaintiff's argument amounts to the absurd proposition that credit card holders who are unable to pay their debt need merely stop payment for 180 days, at which point — through the inexorable interplay of accounting and tax reporting requirements — such debts will automatically become taxable income and be extinguished.  This theory is as ridiculous on its face as it is incoherent in its explanation, and, assuming that it proves anything at all, it may merely suggest that my earlier decision not to impose Rule 11 sanctions on Plaintiff may have

-16-

been too lenient.  (*See* 8/17/07 Order at 6 [noting that Plaintiff may have exposed herself to Rule 11 sanctions by objecting to the authenticity of various documents "without rational basis in an attempt to force the court's denial of Defendant's motion to dismiss"].)

### ii.      *Misrepresentation of the Amount of Plaintiff's Debt*

Plaintiff's argument that Defendant misrepresented the amount of her debt by not disclosing any tax benefits MBNA may have received pursuant to "charging off" this debt is similarly unavailing.  Most glaringly, this argument fails because Plaintiff has adduced no evidence that MBNA actually received such tax benefits, and her mere assumption that it did is pure speculation insufficient to raise a triable issue of fact.  *See Celotex*, 477 U.S. at 324 (requiring nonmovant to designate specific *facts* demonstrating a genuine issue for trial).  More importantly, even if MBNA did receive such tax benefits from the "charging off" Plaintiff's debt, Plaintiff has pointed to no law suggesting that the amount of a private debt is affected by the tax burdens and benefits relating thereto.  (*See* Pl.'s Resp. at 5.)  Instead, the two cases Plaintiff does cite in alleged support of this proposition inappositely discuss: (1) a bank's reporting requirements *to the IRS* upon recovery of a debt that had previously been "charged off" its books; and (2) the proper construction of a clause in an insurance contract having absolutely noting to do with the question at bar.  *See Merchants Nat. Bank of Mobile v. Commissioner*, 199 F. 2d. 657 (5th Cir. 1952)*; St. Paul Fire and Marine Ins. Co. v. Branch Banking and Trust Co.*, 643 F. Supp. 648 (E.D.N.C. 1986).  Accordingly, I find Plaintiff's argument pertaining to an alleged misrepresentation of the amount of Plaintiff's debt to be unavailing.

Based on the foregoing, I find that Plaintiff has failed to demonstrate a triable issue of fact as to whether: (1) Defendant's "charging off" of her debt extinguished this debt as a matter of law; or (2) Defendant misrepresented the amount of Plaintiff's debt to MBNA by not disclosing any tax benefits which may have accrued pursuant to its accounting practices. Accordingly, I dismiss Plaintiff's FDCPA claim predicated upon a violation of section 1692e(2)(A).

      c.      **Sections 1692e(3), 1692e(5), 1692e(7), 1692e(8), 1692e(10), and 1692f(1)**

Having found that there is no triable issue of fact as to whether (1) MBNA sold Plaintiff's debt to Defendant, or (2) this debt was "extinguished" by operation of accounting and tax reporting principles, I hereby dismiss Plaintiff's remaining FDCPA claims premised upon violations of sections 1692e(5), 1692e(7), 1692e(8), 1692e(10), and1692f(1), as each of these claims is based upon some variation of the theory that MBNA either sold Plaintiff's debt to Defendant or that this debt was extinguished.  (*See* Pl.'s Br. at 6–7; Pl.'s Resp. at 5–7.) Moreover, I also dismiss Plaintiff's FDCPA claim predicated upon section 1692e(3) — which bars "the false representation or implication that any individual is an attorney or that any communication is from an attorney" — because Plaintiff admits in her response that "[D]efendant is an attorney."  (*See* Pl.'s Resp. at 6.)  Although Plaintiff's argument on this point is very opaque, she may also suggest that Defendant violated this section by falsely representing that it was an attorney *for MBNA*.  (*See* Pl.'s Resp. at 18.)  To the extent that this is Plaintiff's argument, I find it foreclosed by the unrefuted evidence that Defendant was, in fact, MBNA's

counsel in the NAF proceedings.  (*See* Facts, §1 & n.1, *supra*.)  Accordingly, all of Plaintiff's remaining FDCPA claims are dismissed.

        **d.**       **Defendant's Failure to Seek a Motion to Compel After Plaintiff Objected to the NAF Proceeding**

Lastly, for reasons which escape this court, both parties devote considerable portions of their briefing to the question of whether Defendant was required to seek a court order compelling arbitration in the underlying NAF proceeding after Plaintiff allegedly objected to this proceeding.  (*See, e.g.*, Def.'s Br. at 12–14; Pl.'s Resp. at 7–8; Def.'s Reply at 4.)  This dispute apparently derives from two paragraphs in Plaintiff's complaint in which she alleges that Defendant erred by not formerly seeking such an order after she allegedly objected to the NAF arbitration.  (*See* Am. Compl. ¶¶ 10, 12.)

While resolution of this dispute might interest the parties, I find it is irrelevant to the instant summary judgment motions as Plaintiff has set forth no argument in her briefing that Defendant's failure to seek an order compelling arbitration violated any provision of the FDCPA.  (*See* Pl.'s Br.; Pl.'s Resp.; Pl.'s Reply.)  Because I see no obvious fit between Defendant's alleged procedural misstep in not pursuing a motion to compel arbitration and any of Plaintiff's FDCPA claims, and because I decline to invent such a fit for Plaintiff, I find that she has failed to satisfy her summary judgment burden of demonstrating a "genuine" issue for trial on any identifiable claim.  *See, e.g.*, *Allen*, 119 F.3d at 839 (defining a "genuine" dispute as one which might lead a reasonable jury to return a verdict for the nonmoving party).

Moreover, I alternatively find that, even assuming Plaintiff had managed to shoehorn this alleged procedural misstep into some particular FDCPA claim, such an effort would have been in vain because the Federal Arbitration Act ("FAA") "'provides the exclusive remedy for challenging conduct that taints an arbitration award within the Act's coverage.'" *Nazar v. Wolpoff & Abramson*, LLP, 530 F. Supp. 2d 1161, 1168 (D. Kan. 2008) (citation omitted). Under the FAA, a party must move to vacate, modify, or correct any erroneous arbitration award within three months of its issuance, and it is undisputed that Plaintiff did not so move after the arbitrator's January 2006 issuance of his award.  9 U.S.C. § 12 (2006); (Def.'s Br., SOF ¶ 7; *admitted at* Pl.'s Resp., RSOF ¶ 7.)  Accordingly, I find that any FDCPA claim which may properly be based upon Defendant's alleged failure to seek an order compelling arbitration would necessarily constitute an impermissible collateral attack on the arbitration award.  *See, e.g.*, *Nazar*, 530 F. Supp. 2d at 1170 (finding a plaintiff's "belated challenge to the arbitration award" premised upon an alleged consumer protection act violation to be an "impermissible collateral attack" precluding the court's review).

**3.     *Conclusion***

Based on the foregoing it is therefore ORDERED that:

1.     DEFENDANT's motion (#47) is GRANTED.

2.     PLAINTIFF's motion (#49) is DENIED.

The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff, dismissing Plaintiff's claims with prejudice.  Defendants may have their costs by filing a bill of costs within eleven days of the date of this order.

-20-

Dated this 10th day of June, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge